# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

FIDELITY NATIONAL TITLE
INSURANCE COMPANY

      Plaintiff,

                                     Case No. 06-cv-13961

v.                                  Hon. Anna Diggs Taylor

TITLE FIRST AGENCY, INC.,
TITLE FIRST AGENCY OF MICHIGAN, LLC,
GEORGE HENRY and PROFESSIONAL
TITLE AGENCY, LLC,,

      Defendants,

_____/

## MEMORANDUM OPINION AND ORDER

### I.

*Introduction*

      This matter having come before the Court on Defendants' Motion for Summary Judgment and Plaintiff's Motion for Summary Judgment as to Defendants' Counterclaim, for the reasons explained below, Plaintiff's motion is GRANTED IN PART and DENIED IN PART and Defendants' motion is DENIED.

**Background**

      Plaintiff, Fidelity National Title Insurance Company (hereinafter "Fidelity"), is an underwriter of title insurance and also sells title insurance at the retail level. Also, Fidelity sells title insurance through independent non-exclusive and strictly limited agency relationships. Defendant Title First Agency Inc., LLC and Professional Title Agency, LLC (collectively hereinafter "Title First") are an independent title insurance agent in the Midwest. During all of the relevant time period, Defendant

George Henry was either Title First's Chief Executive Officer (CEO), President, General Counsel and principal owner.

On February 9, 1996, Fidelity and Title First entered into an Issuing Agency Agreement (hereinafter "the Agreement"), in which Fidelity appointed and authorized Title First solely to countersign and issue insurance commitments, binders, guarantees, endorsements, title policies of company, or any other form whereby company assumes liability in agent's territory as set forth in Schedule A of the Agreement  Further, Schedule A provided that Title First's territory consisted of Michigan, Ohio, Indiana, Kentucky and the western half of Pennsylvania.  The Agreement was for an initial five-year term with an automatic renewal for a second  five-year term, subject to six months notice of non-renewal by either party.  The following integration clause is also included in the Agreement:

> [t]his Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, supersedes all prior discussions, understandings or agreements between the Parties and shall not be amended, modified, or otherwise changed in any manner except in writing by the Parties.

The Agreement also contained a no waiver clause which provided:

> By failing to exercise any of its rights hereunder, [Fidelity] shall not be deemed to have waived any breach on the part of [Title First] or to have released [Title First] from its obligations hereunder. The waiver by either party of a breach of any provision of this Agreement shall not be deemed a continuing waiver or a waiver of any subsequent breach of any provision of this Agreement.

Further, Schedule A of the Agreement provides that the contract is be construed, enforced and governed according to and by the laws of the states of California and Ohio in all respects.  Further, under the Agreement, Fidelity was obliged to refer title insurance and information business to Title

First. This provision–located at Schedule C of the Agreement and entitled NATIONAL REFERRAL BUSINESS– provides:

> [Fidelity] agrees to refer to [Title First] the title insurance information business which relates to property located within the territory of [Title First]. [Fidelity] agrees that [Title First's] percentage of total referred business will be equal to or greater than the amount of gross income to [Fidelity] for that territory but in no event shall agent receive less than 50% of total referred business, exclusive of referrals for the state of Michigan.

Schedule D is entitled the "DEVELOPMENT, START UP AND EQUITY AGREEMENT." Schedule D also contains language indicating that it is an addendum to the Agreement. It is Title First's position that the purpose of the Schedule D was for Title First to develop maintain and operate a title insurance agency office in the Indianapolis, Indiana, Cleveland, Ohio, and Pittsburgh, Pennsylvania to engage in the business of selling title insurance and all other activities reasonable and necessary to accomplish such purpose. Additionally, Fidelity agreed to advance monies necessary to capitalize and to fund the operational deficits for a period of eighteen months in the manner that it deemed best. Further, Schedule D contained a committed revenue requirement, which provided:

> Committed Revenues of Premiums from Title First Agency, Inc. Title First Agency, Inc. agrees during the term of the Issuing Agency Agreement, to commit 50% of its revenues derived from premiums for the sale of title insurance to be written on Fidelity National Title Insurance paper, during the first year of the Agreement. In the second year, it agrees to commit 60%, third year 70%, fourth year and thereafter, 80% of its title insurance premium revenue to be written on Fidelity National Title Insurance Company paper.

Fidelity claims that Title First was the only entity which possessed the information necessary to calculate its obligation under the above provision. Indeed, Fidelity states that it was not until Title First finally produced the necessary information, during discovery in the instant case, that Fedility learned of the fact and extent of Title First's breaches of this provision.

Title First does not believe that Schedule D is part of the Agreement.  Title First proffers that the reason for this separate agreement was to act as a security mechanism for the $150,000 loan from Fidelity to Title First for the purpose of opening title insurance offices in Indianapolis, Cleveland and Pittsburgh.  As further support of Title First's position that Schedule D is not a part of the Agreement, Title First emphasizes that Schedule D contains its own modification provision.

In December of 1996, the parties modified the Committed Revenue Requirement by a letter agreement from Tom Simonton, Fidelity's former Vice President and Midwest Regional Manager to Mr. Henry eliminating Michigan from the Committed Revenues of Premiums requirement.  In October of 1998, Title First avers that Mr. Henry and Mr. Simonton agreed to discharge the Committed Revenues provision because of Fidelity's failure to perform its obligations under Schedule D.  Fidelity does not believe that this requirement was eliminated in 1998.

For almost ten years, Fidelity and Title First operated under this Agreement and throughout the Agreement it is undisputed that Title First acted as an independent non-exclusive agent for Fidelity.  Indeed, Fidelity stresses that the agreement was non-exclusive on both sides and even provided that the parties could directly compete against each other.  Title First states that as a result of its agreement with Fidelity, it gave Fidelity unfettered access to all of its proprietary information which included its financial records, financial reports and data submitted to regulatory agencies.  Further, Title First stresses that Fidelity had access to every aspect of its business including its relationship with other underwriters, customers, and its employees.  Title First claims that this access was not reciprocated.

In March of 2000, Fidelity expanded its presence in the Midwest when it purchased Chicago Title Insurance Company.  According to Title First, over time Fidelity decided that direct, in-house

operations were more profitable than agency relationships. This is because when Fidelity sells title insurance polices directly it controls 100% of the premiums compared to just 12-15% of the premiums when it does so by an agency relationship. In June of 2004,Fidelity attempted to buy Title First and Title First refused to sell.

Shortly after Title First refused to sell its operation to Fidelity, Title First contends that Fidelity began to lure away its employees. One of those employees was Patricia Gallagher who was the manager of Title First's Michigan and Indiana operations. In 1996, Ms. Gallagher was a Fidelity employee. During that same year she began working for Title First, In November 2004, Ms. Gallagher was in a meeting with several members of Title First's top tier management and was allegedly verbally accosted and belittled by Mr. Henry. In this meeting, Mr. Henry allegedly called her a fucking idiot. Fidelity maintains that in December 2004, Ms. Gallagher told Margo Hannum, Fidelity's legal counsel, that she was unhappy working for Title First and would probably would not continue to work for Title First.

In March 2005, Robert Wineman, Fidelity's Vice President and Manager of its Great Lakes Region, began searching for qualified candidates to manage its retail operations for the Great Lakes Region. On March 17, 2005, Mr. Wineman met with Ms. Gallagher and offered her the job and on April 22, 2005, Ms. Gallagher accepted the offer. Sometime thereafter, Ms. Gallagher resigned from Title First. Fidelity alleges that on April 26, 2005, in an attempt to retain Ms. Gallagher as an employee, Mr. Henry offered her a higher salary and more in fringe benefits and Ms. Gallagher rejected the offer.

Title First claims that Gallagher's alleged unhappiness only served as an excuse for Fidelity to entice her to work for Fidelity and to garner her revenue attached business. Further, Title First

maintains that after Fidelity conducted repeated audits to ascertain privileged Title First information, Fidelity used this information to identify Ms. Gallagher as someone with revenue attached business. Fidelity hired Ms. Gallagher to manage its direct operation, which was being established in the territory that Title First had operated in as a Fidelity agent for nine years. Title First alleges that once Fidelity enticed Ms. Gallagher away, it began to pursue the rest of Title First's Michigan employees. Indeed, soon after Ms. Gallagher's departure, Krist Abraham and Emma Priest (two individuals in the next tier of Title First's management) announced that they would be following Ms. Gallagher to Fidelity. Moreover, at the time of their departure, Ms. Priest and Ms. Abraham stated that they would be disappointed if the rest of Title First's Michigan employees did not follow them. Title First states that it was at this time, that it realized that it would no longer be able to operate its Michigan office and that it would be forced to capitulate to Fidelity's demands.

After Fidelity gained control of Title First's Michigan operations, Title First states that Fidelity began to target its Northern Ohio operations. This started with Fidelity's alleged recruitment of John Ross, the manager of Title First's Northern Operations. Mr. Ross, like Ms. Gallagher, was a person with revenue attached business. Once Mr. Ross was recruited, other Title First's employees from the Northern Operations began to follow him.

**The Asset Purchase Agreement**

On May 2, 2005, Fidelity and Title First entered into an Asset Purchase Agreement (hereinafter the "APA") whereby Fidelity agreed to purchase all of Title First's:

> (a) Tangible Personal Property; (b) inventories;(c) rights under Title First's Leases; (d) data and Records related to the Assets and Assumed Liabilities; and (e) all claims of Title First against third parties relating to the Assets, whether choate or inchoate, known or unknown, contingent or non-contingent.

The Agreement also stated that it "was negotiated by the parties with the benefit of legal representation." Additionally, Section 10.2 of the APA provided:

> Business Relationship.  After the Closing, Sellers will cooperate with Buyer in efforts to continue and maintain for the benefit of Buyer those business relationships of Sellers existing prior to the closing and relating to lessors, employees, and suppliers and Sellers will satisfy the Retained Liabilities in a manner that is not detrimental to any of such relationships. Neither Sellers nor any of its officers, employees, agents or shareholders shall take any action that would tend to interfere with the business of Buyer to be engaged in after the Closing, including disparaging the name or business of Buyer.

Fidelity has interpreted this section to mean that Title First and Mr. Henry were required to: (1) cooperate with Fidelity in maintaining its employees and; (2) not interfere with Fidelity's business, including soliciting customers and re-opening its Michigan offices.  Moreover, Fidelity states that an APA Letter Addendum expressly required Title First to pay Fidelity premiums for certain transactions closed where Fidelity was to be the underwriter:

> for [Fidelity] paper closed files for which policies have not been issued, but for which Title First has already received payment of the premium, Title First will pay [Fidelity] the customary 15% underwriter fee per the agency contract.

Title First alleges that it was coerced under duress to enter into the APA.  This is because, in addition to raiding its employees, Title First asserts that Fidelity failed to provide the requisite volume of national referral business that was required under the Agreement.  Indeed, Title First contends that Fidelity ignored its contractual obligation to provide national referral business to Title First throughout the agency relationship despite being notified repeatedly.  According to Title First, Fidelity also refused to provide it with the requisite policy jackets it needed to finish files Fidelity did not complete.  Moreover, Title First claims that this course of action resulted in Title First's inability to satisfy the

needs and expectations of its customers, as well as its obligations to them, which damaged Title First's good name.

According to Fidelity, within days after the APA was signed, Title First wrongfully reopened its Michigan operations. Mr. Henry eventually sold his entire Title First operations (including the re-opened Michigan operations) to CBC Innovis Title Agency for $21 million.

On June 30, 2005, Fidelity gave notice (226 days instead of the 90 day minimum) of its right not to renew the Agreement. It is undisputed that the notice was both proper and timely This meant the Agreement would end on February 1, 2006. Fidelity claims that Title First did not pay all premiums due to Fedility immediately upon termination of the Agreement. Fidelity claims that Title First delayed paying premiums to Fidelity over one or even two years. Indeed, Fidelity alleges that it was only after this lawsuit was filed that Title First begin to remit premiums due and owing to Fidelity. Since the filing of the lawsuit, Title First has remitted approximately $360,000 in premiums to Fidelity that Title First had allegedly improperly commingled in its operating account.

## II.

### *Legal Standard*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251-52 (1986).

III.

*Analysis*

**FIDELITY'S MOTION FOR SUMMARY JUDGMENT**

**I.      Title First Lacks Standing**

As a threshold matter, Fidelity argues that Title First is not a real party at interest and thus, does not have standing to bring this action.  Fidelity argues that Mr. Henry, as Title First's FED. R. CIV. P. 30(b)(6) designee, testified that all of Title First's rights to any claims asserted against Fidelity in this lawsuit were assigned to him as part of the sale of Title First stock to CBC.  Further, Fidelity asserts that under *ACLU v. NSA*, 493 F.3d 644, 691 (6ᵗʰ Cir. 2007), a party invoking federal jurisdiction bears the burden of establishing the elements of standing. Title First counters arguing that while Mr. Henry will receive the monetary benefits of any recovery by Title First in this lawsuit, Title First as the injured party properly brought the Counterclaims in this action.  As explained in greater detail below, this court holds that Title First has standing.

A plaintiff has standing "when he or she can show: (1) an injury-in-fact that (2) was 'fairly traceable to the defendant's allegedly unlawful conduct' and (3) is 'likely to be redressed' via a favorable decision." *Schultz v. U.S.* 529 F.3d 343 (6ᵗʰ Cir. 2008) quoting *Prime Media, Inc. v. City of Brentwood,* 485 F.3d 343, 349 (6ᵗʰ Cir.2007).  In the instant case, it is undisputed that Title First has alleged injuries in fact that are traceable to Fidelity's alleged conduct that can be redressed by a favorable decision.  Indeed, Fidelity has not cited to one case holding that a party is deprived of standing simply because the monetary benefits from any recovery may flow to another party. Consequently, this court holds that Title First does have standing to bring its claims.

9

## II.     Title First's Breach of Fiduciary Duty Claim

Fidelity argues that Title First erroneously claims that Fidelity's fiduciary duty arises from their agreement.  As stated, *supra*, the Agreement has a choice of law provision, which dictates that either California or Ohio law should be applied.  The Michigan Supreme Court has held that such provisions are valid unless: (1) the chosen state has no substantial relationship to the parties or the transaction; (2) there is no reasonable basis for choosing that state's law; or (3) if the application of the provision would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue.  *Chrysler Corp v Skyline Industrial Services, Inc,* 448 Mich. 113, 126 (1995).  Neither party argues that any of these exceptions should be applied, therefore, Ohio law will be applied.

Under Ohio law, to sustain a claim of breach of a fiduciary duty, a plaintiff must show: (1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately therefrom." *Harwood v. Pappas & Assoc., Cuyahoga* App. No. 84761, 2005-Ohio-2442.  Further, "[a] 'fiduciary' has been defined as 'a person having a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking." *Strock v. Pressnell* (1988), 38 Ohio St.3d 207.  A claim of breach of fiduciary duty is basically a claim for negligence that involves a higher standard of care.  *Camp St. Mary's Assn. of the W. Ohio Conference of United Methodist Church, Inc. v. Otterbein Homes* 176 Ohio App.3d 54, 889 N.E.2d 1066, 1077 (Ohio App. 3 Dist. 2008).  "In order to recover, one must show the existence of a duty on the part of the alleged wrongdoer not to subject such person to the injury complained of, a failure to observe such duty, and an injury proximately resulting therefrom." *Id.*

Fidelity argues that under the Agreement, it is the principal and Title First is the agent and as a matter of law, a principal does not owe an agent a fiduciary duty. In support of this argument, Fidelity relies upon various cases on the Restatement (Third) of Agency, which in pertinent part states:

> If the relationship between two persons is one of agency as defined in this section, the agent owes a fiduciary obligation to the principal. . . . The obligations that a principal owes an agent, specified in §§ 8.13–8.15, are not fiduciary.

Title First argues that throughout the life of the Agreement, it entrusted Fidelity with "unfettered access" to its data submitted to regulatory agencies, financial records and reports. Further, Title First contends that Fidelity breached its fiduciary duty when Fedility used confidential information to hire Title First's employees away and to gain access to Title First's customers. Essentially, Title First has alleged that Fidelity used Title First's confidential information to usurp its Michigan operations.

This court is not persuaded that Title First has presented sufficient evidence to survive Fidelity's motion on this claim. First, this court agrees that as the principal under the Agreement, Fidelity does not owe Title First a fiduciary duty. As a the principal in this the Agreement, the restatement makes it clear that Fidelity does not owe Title First a special duty. Second, assuming arguendo that Fidelity had a fiduciary duty arising out of their relationship, Title First has not presented any evidence showing that Fidelity breached this duty. Outside of conclusory allegations, Title First has not shown that Fidelity used confidential information it obtained from Title First to hire Ms. Gallagher or any other Title First employee. Indeed, Ms. Gallagher was a Fidelity employee prior to her being employed by Title First. Hence, it is reasonable to assume that Fidelity's interest in Ms. Gallagher was based upon its own previous employment relationship with her and not from any

confidential information Fidelity had gleaned from Title First. Finally, Title First has not produced any evidence to support its claim that Fidelity used any confidential information to gain access to its customers. Title First appears to allege that Fidelity gained this information from Ms. Gallagher. Title First, however, does not explain how Ms. Gallagher divulgence of this information to Fidelity constituted a breach of a fiduciary duty, given the fact that she was not a Title First employee when the information was allegedly divulged. Consequently, Fidelity's motion with respect to this claim must be granted.

**III.     Title First's Claims for Tortious Interference with Contract and Business Relationships**

Fidelity argues that Michigan law should be applied because Michigan has greater than a minimal interest in the matter. In contrast, Title First argues that in compliance with the choice of law provision, Ohio law should apply. Title First, however, does not address Fidelity's argument as to why Michigan law should apply to this claim. Moreover, Title First's arguments rely heavily on Michigan law and therefore, this court will apply Michigan law to this claim.

Title First alleges that Fidelity tortiously interfered with its business relationships with its customers and employees. Fidelity asserts that it is entitled to summary judgment on these claims because: (1) Title First did not have a valid business relationship or expectancy with the at-will Michigan employees it fired; (2) the recruitment and hiring of Ms. Gallagher and Mr. Ross is not actionable and; (3) Fidelity actions were not illegal, or unethical, or fraudulent.

The elements of tortious interference with a contract are: (1) a contract, (2) a breach, and (3) an unjustified instigation of the breach by defendant. *Derderian v. Genesys Health Care Systems*, 263

Mich. App. 364, 382 (2004).[1]  Tortious interference with contract exists when a third party to a

contract, knowing of the contract, intentionally and wrongfully induces a breach of the contract which

results in damage to a non-breaching party.  *Mino v. Clio School District,* 255 Mich. App. 60, 78

(2003).  To establish a prima facie case of tortious interference with a business relationship, a plaintiff

must show: (1) the existence of a valid business relationship (not necessarily evidenced by an

enforceable contract) or expectancy; (2) knowledge of the relationship or expectancy on the part of

the defendant; (3) intentional interference inducing or causing a breach or termination of the

relationship or expectancy; and (4) resultant damage.  *Bonelli v. Volkswagen of America, Inc.,* 166

Mich. App. 483, 496, 421 N.W.2d 213 (1988).  A plaintiff may maintain an action for tortious

interference with an at-will employment contract.  *Feaheny v. Caldwell, 175 Mich .App*. 291, 304

(1989).  One who alleges tortious interference with a business relationship must allege the intentional

doing of a per se wrongful act or the doing of a lawful act with malice and without justification in law,

for the purpose of invading the contractual rights or business relationship of another.  *Jerico*

*Construction, Inc. v. Quandrant, Inc.,* 1999 WL 33453392 at 2.  To establish that a lawful act was

done with malice and without justification,  plaintiff must demonstrate, with specificity, affirmative

acts by defendant that corroborate the improper motive of the interference.  *Id.*  Improper means

illegal, unethical, or fraudulent. *Id.*

    In support of Title First's claims that Fidelity interfered with its business relationship with its

employees, Title First relies heavily on the *Jerico* case.  In *Jerico,* plaintiff was a subcontractor for

defendant and defendant offered wages in excess of the union scale wages to four of plaintiff's

---

[1]Neither party has argued that Ohio law should be applied to this claim, therefore, this
court will apply Michigan law.

employees, which enticed them away from plaintiff and into defendant's employ. Because plaintiff lost these employees, plaintiff alleged that it could not meet the future projects that it had agreed to undertake with defendant. Plaintiff filed a suit alleging tortious interference with a business relationship and defendant filed a motion for summary disposition, which the trial court granted. The Michigan Court of Appeals reversed, stating:

> We find that plaintiff's allegations, as accepted as true, are sufficient to set forth the elements of tortious interference with a business relationship. Further, we reject [defendant's] contention that its act of hiring away plaintiff's four employees is lawful and can never be considered to be done with malice and without justification. This Court has held that there can be interference with an employment contract that is terminable at will. *Jerico Construction, Inc. v. Quandrant, Inc.,* 1999 WL 33453392 at 2.

In the instant case, Title First has presented evidence that Fidelity targeted and hired away "extremely valuable" employees from its Northern Ohio operations. Indeed, Title First has presented evidence to support its claim that Fidelity enticed some of these employees away by offering higher salaries. Additionally, Title First avers that Ms. Gallagher made Fidelity aware of its highly trained employees and Ms. Gallagher knew that these employees constituted Title First's core workforce. Moreover, Title First contends that Fidelity's actions made Title First incapable of sustaining its Michigan operations and was therefore subsequently forced to sell its operations to Fidelity under the "duress"APA. Fidelity argues that no reasonable jury could conclude that Title First had an expectation of a relationship with employees that it had chosen to terminate. In response, Title First contends that these employees were going to leave with Ms. Gallagher and, as an accommodation, these employees were transferred to Fidelity to allow for the continuation of their health care benefits. In light of the evidence that Title First has presented to support these claims, this court must conclude

that there is genuine issue of material fact as to whether Fidelity tortiously interfered with Title First's contracts and business relationships with its employees.

Similarly, Title First's claims that Fidelity tortiously interfered with its business relationship with its customers must also be sustained. Title First avers that Fidelity's failure to complete Michigan transition files and to provide policy jackets had an adverse impact on its business relationship with its customers which included but was not limited to GMAC, Tranex and Flagstar. Further, Title First alleges that Fidelity's failure to provide the requisite volume of national referral business and its improper termination of the Agreement affected Title First's ability to service its customers. Moreover, Title First maintains that Fidelity carried out these actions with the intent to negatively impact Title First's relationship with its customers. Accordingly, viewing the facts in a light most favorable to Title First, this court is convinced that Title First has presented sufficient evidence to survive summary judgment on its claim that Fidelity tortiously interfered with Title First's contracts and business relationships with its customers.

## IV.    Title First's Breach of Contract Claim

Title First alleges that Fidelity breached the Agreement when it failed to provide policy jackets, which Title First needed to issue Fidelity's title insurance. Further, Title First alleges that Fidelity breached the contract by failing to comply with the National Referral Business provision of the Agreement and breached its duty of good faith and fair dealing. Fidelity argues that Title First's claim must fail for the following reasons: (1) Fidelity has provided Title First with the policy jackets it requested and; (2) Title First's claim regrading the breach of the National Referral Business Provision is barred by the doctrines of laches and waiver.

Under Ohio law, the elements of breach of contract: (1) the existence of a contract; (2) plaintiff's performance of the contract; (3) defendant's nonperformance of the contract without legal justification; and (4) damages suffered by plaintiff. *Phillips v. Spitzer Chevrolet Company, Stark* App. No.2006-CA-00002, 2006-Ohio-4701. It is undisputed that the parties had a contract. Thus, the first element is met. Further, Title First has presented enough evidence to support its allegation that Fidelity breached the contract by failing to provide policy jackets and by failing to comply with the National Business Referral provision of the Agreement. In support of its Motion for Summary Judgment, however, Fidelity has asserted the affirmative defenses of laches and waiver. For the ensuing reasons, this court rejects Fidelity's arguments.

Under Ohio law, the elements of laches are (1) unreasonable delay or lapse of time in asserting a right, (2) absence of an excuse for the delay, (3) knowledge, actual or constructive, of the injury or wrong, and (4) prejudice to the other party. *State ex rel. Polo v. Cuyahoga Cty. Bd. of Elections* 74 Ohio St.3d 143, 145, (1995). Waiver, as applied to contracts, is a voluntary relinquishment of a known right. *State ex rel. Wallace v. State Med. Bd. of Ohio* (2000), 89 Ohio St.3d 431, 435, 732 N.E.2d 960. Waiver assumes one has an opportunity to choose between either relinquishing or enforcing of the right. *Chubb v. Ohio Bur. of Workers' Comp.* (1998), 81 Ohio St.3d 275, 279, 690 N.E.2d 1267. A party who has a duty to perform and who changes its position as a result of the waiver may enforce the waiver. *Id.* at 279, 690 N.E.2d 1267, citing *Andrews v. State Teachers Retirement Sys.* (1980), 62 Ohio St.2d 202, 205, 404 N.E.2d 747. The party asserting waiver must prove the waiving party's clear, unequivocal, decisive act. *State ex rel. Ohio Dept. of Mental Health v. Nadel,* 98 Ohio St.3d 405, 786 N.E.2d 49, 2003-Ohio-1632, at ¶ 16.

Fidelity argues that under the National Referral Business provision Title First had a duty to put Fidelity on notice of any alleged shortfalls in the annual referrals. Moreover, Fidelity alleges that Title First failed to preserve evidence showing that Fidelity met the required number of referrals. Indeed, Fidelity asserts that Title First waited almost ten years before it asserted its rights under the National Referral Business provision. Hence, Fidelity submits that this constituted an unreasonable delay and thus, Title First is claim of breach contract under this provision should be barred.

Title First counters this argument with deposition testimony from Tom Simonton, Fidelity's Vice President and Midwest Regional Manager, who testified that Title First notified him several times over the lifetime of the contract of Fidelity's shortfalls in referrals. Further, Mr. Henry testified that he notified Fidelity of these shortfalls "early and often." Indeed, Title First produced a letter from Mr. Henry to Mr. Simonton notifying Fidelity of its failure to provide national referral business. Moreover, Title First has proffered similar deposition testimony from James Hewitt, Title First's President and James Kilgallon, Fidelity's former Executive Vice President and Director of National Title Services. Construing this evidence in light most favorable to Title First, this court concludes that Title First did not engage in an unreasonable delay in asserting its rights under the National Referral Business provision. Similarly, this court finds that the waiver doctrine cannot apply, since Title First has presented evidence supporting its argument that it never explicitly or implicitly waived its rights under the National Referral Business provision. Consequently, Fidelity's request that Title First's breach of contract claim be dismissed pursuant to the doctrines of laches and waiver must be denied.

## V.      Title First's Promissory Estoppel Claim

Title First submits that because the APA was entered into under duress, that contract is unenforceable and thus, Title First is permitted to bring a claim of promissory estoppel regarding

Fidelity's promise to finish in-process Michigan business. Fidelity argues that Title First cannot avail itself of a promissory estoppel claim because the promise that it allegedly detrimentally relied upon is part of the contract.

The parties do not argue that Ohio law should be applied to this claim. Moreover, as both of the parties rely on Michigan law to support their arguments. Therefore, the court will apply Michigan law.

The elements of a claim of promissory estoppel consist of (1) a promise, (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promise, (3) which in fact produced reliance or forbearance of that nature, and (4) in circumstances such that the promise must be enforced if injustice is to be avoided. *Zaremba Equipment, Inc. v. Harco Nat. Ins. Co.*, 2008 WL 2941389. Courts should cautiously evaluate an estoppel claim and apply the doctrine only if "the facts are unquestionable and the wrong to be prevented undoubted." *Novak v. Nationwide Mutual Ins. Co.,* 235 Mich. App 675, 687 (1999). A claim for promissory estoppel is not viable when a written contract exists between the parties that covers the same subject matter. *Polimeni v. General Motors Corp.*, 2007 WL 1791894 (2007).

Here, because a written contract underlies this case and Title First's performance in reliance on the alleged promise is the same performance required under the APA, Title First's promissory estoppel theory is inapplicable. Therefore, Fidelity's Motion for Summary Judgement on this claim must be granted.

## VI.     Title First's Claim for Quantum Meruit/Unjust Enrichment

Title First alleges that its unjust enrichment claim results from a multi-state commercial transaction where Title First did the title work on Fidelity's behalf and was not compensated. Fidelity

argues that it is entitled to summary judgment on this claim because Title First has sued the wrong party and there is an express contract provision which governs this issue, thus precluding this quasi-contractual claim.

A claim of quantum meruit or unjust enrichment is equitable in nature. *Morris Pumps v. Centerline Piping, Inc,* 273 Mich. App 187, 195; 729 NW2d 898 (2006). A claim of this type requires that a plaintiff show: (1) the receipt of a benefit by defendant from plaintiff, and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant." *Belle Isle Grill Corp v. Detroit,* 256 Mich. App 463, 478 (2003). The law implies a contract to prevent unjust enrichment. *Id.* A claim of unjust enrichment does not apply if there is an express contract, *Martin v. East Lansing School Dist.,* 193 Mich .App. 166, 177, 483 N.W.2d 656 (1992), and the same is true for a quantum meruit claim. *Dykema Gossett PLLC v. Ajluni,* 273 Mich .App. 1, 8-9, 730 N.W.2d 29 (2006).

Here, Title First's claim for Quantum Meruit/Unjust Enrichment must be dismissed, since there is an express contract between the parties.

## VII.    Title First's Claims for Punitive and Exemplary Damages

Fidelity argues that it is entitled to summary judgment on the issue of punitive damages because Michigan law applies to Title First's claim for punitive damages and Michigan law prohibits an award of punitive damages unless provided by statute. Title First asserts that Ohio law should apply because of the Choice of Law Provision in the Agreement.

As stated *supra,* The Michigan Supreme Court has held that such provisions are valid unless: (1) the chosen state has no substantial relationship to the parties or the transaction; (2) there is no reasonable basis for choosing that state's law; or (3) if the application of the provision would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state

19

in the determination of the particular issue. *Chrysler Corp v Skyline Industrial Services, Inc,* 448 Mich. 113, 126 (1995).

Fidelity argues that Michigan's fundamental policy is to refuse to impose punitive damages on its defendants in order to promote: (1) the financial stability of the businesses that conduct their affairs within its borders, and (2) the overall economic well-being of its citizenry. *In re Disaster at Detroit Metropolitan Airport* 750 F .Supp. 793, 805 (E.D. Mich.1989). This policy, however, is not applicable here, where the parties have chosen which law would govern claims arising out of their Agreement. Indeed, the parties have amended their Agreement on several occasions and the parties could have easily chosen to have Michigan law govern their agreement. The parties have chosen to have Ohio govern. Accordingly, the court does not find that the state of Michigan has a materially greater interest than the chosen state in the determination of whether punitive damages should be allowed.[2]

## VIII.   Title First's Abuse of Process Claim

Fidelity asserts that Title First's abuse of process claim is frivolous, since the Agreement specified that a lawsuit could be filed in the state or federal courts in Michigan. Title First submits that Fidelity perverted the proceeding by engaging in private mediation as a smokescreen while it filed the instant action with this court. Title First further alleges that it was damaged by Fidelity's abuse of process because, among other things, it was forced to expend money preparing for and participating in a sham mediation.

---

[2]Contrary to Fidelity's arguments, under Michigan law, a plaintiff's status as a corporation does not preclude it from receiving exemplary damages. *Jackson Printing Co., Inc. v. Mitan,* 169 Mich. App. 334, 341; 425 N.W.2d 791 (1988).

In order to establish a claim of abuse of process, a plaintiff must satisfy three elements: (1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful use of process. *Robb v. Chagrin Lagoons Yacht Club* (1996), 75 Ohio St.3d 264, 271, 662 N.E.2d 9, quoting *Yaklevich v. Kemp, Schaeffer & Rowe Co., L.P.A.* (1994), 68 Ohio St.3d 294, 298, 626 N.E.2d 115. The key consideration in an abuse of process action is whether an improper purpose was sought to be achieved by the use of a lawfully brought previous action. *Yaklevich,* at 300, 626 N.E.2d 115.

In the instant case, Title First has not shown that any of the elements for abuse of process have been met. Indeed, Title First has not cited to any case holding that filing a lawsuit while being engaged in mediation is a per se abuse of process. Consequently, Title First's abuse of process claim must be dismissed.

## XI.    Title First's Claims for an Accounting and Setoff/Recoupment

Fidelity argues that Accounting and Setoff/Recoupment are not causes of action and therefore, Title First cannot seek recovery under these theories. Title First contends that Fidelity's argument is without merit. Title First relies on *Executone of Columbus, Inc. v. Inter-Tel, Inc.* 2007 WL 1144866 (S.D. Ohio April 16, 2007). This case, however, is not helpful to Title First, since the court held :

> It will be the rare case where an equitable accounting lies, since legal remedies are more adequate; discovery is liberal under the Federal Rules of Civil Procedure; and the requirement of inadequacy of remedy at law remains the same. Here, Defendants have argued for their need to perform discovery rather than establishing the inadequacy of their relief at law. (Citation Omitted). Defendants' case is not one of those "rare cases" since their damages are readily ascertainable through discovery. Accordingly, the Court finds dismissal of Plaintiffs' accounting claim proper.

The same is true here. Title First's case is not one of those rare cases, since its damages are readily ascertainable through discovery. Therefore, the court finds dismissal of Title First's accounting claim proper.

With respect to Title First's claim for Setoff and Recoupment "the Supreme Court of Ohio has held that '[a] claim of a defendant which would be barred by the statute of limitations if brought in an action for affirmative relief is available as a defense or under the common law theory of recoupment, when the claim arises out of the same transaction as the plaintiff's claim for relief, and when it is offered only to reduce the plaintiff's right to relief.'" *Sreshta v. Kaydan,* 1999 WL 285047, * 5; quoting *Riley v. Montgomery* (1984), 11 Ohio St.3d 75, 11 OBR 319, 463 N.E.2d 1246. Here, Title First has not shown why it is entitled to any recovery under the theories of Recoupment or Setoff. Accordingly, this claim is dismissed.

## TITLE FIRST'S MOTION FOR SUMMARY JUDGMENT

### I.       Fidelity's Claim For Breach of the Contract (The Agreement)

Title First argues that Fidelity's claim for breach of contract (the Agreement) must fail for the following reasons: (1) Fidelity's claim for unremitted premiums is fallacious, since no remittances are due to Fidelity at this time; (2) any claims regarding Schedule D is not properly before this court, since Fidelity did not allege a breach of this separate agreement in its Complaint. Fidelity rebuts this argument averring that Title First breached the clear and unambiguous terms of the Agreement by: (a) failing to meet the Committed Revenues Requirement and (b) failing to remit premiums timely to Fidelity.

Generally, in order to establish a breach of contract, it must be shown by a preponderance of the evidence that (1) a contract existed, (2) one party fulfilled his obligations, (3) the other party failed

to fulfill his obligations, and (4) damages resulted from that failure. *Spano Bros. Constr. Co., Inc. v. Adolph Johnson & Son Co.,* 9th Dist. No. 23405, 2007-Ohio-1427, 2007 WL 912229, ¶ 12. However, since the parties disagree about whether or not Schedule D is a part of the Agreement, this court must utilize contract construction to ascertain and give effect to the intent of the parties. *Brakefire, Inc. v. Overbeck* 144 Ohio Misc.2d 35, 878 N.E.2d 84, 99 (2007). Generally, a court will presume that the intent of the parties resides in the language they employ in the agreement. *Id.* citing *Graham v. Drydock Coal Co.* (1996), 76 Ohio St.3d 311, 313, 667 N.E.2d 949. The instrument itself should be read as a whole when determining the intent of the parties. *Brakefire Inc.,* 878 N.E.2d at 99. When reading the contract, common words will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument. *Id.* The court should not interpret the words beyond their plain meaning or rewrite the contract if there is no ambiguity in the language of the contract itself. *Id.* If no ambiguity appears on the face of the contract, parol evidence will not be considered in an effort to demonstrate an ambiguity.

Here, Schedule D is clearly entitled "DEVELOPMENT, START UP, AND EQUITY AGREEMENT" and it contains the following language: "This addendum to the Issuing Agency Agreement." Merriam-Webster's Online Dictionary defines addendum as: "a thing added: ADDITION.[3]" Therefore, looking at the clear and unambiguous language of Schedule D, the court concludes that the parties intended Schedule D to be an addition to the Agreement.

Title First posits that Fidelity's claims under Schedule D must fail because: (1) Schedule D was discharged by Fidelity's failure to perform; (2) Schedule D was discharged by Release; (3) Schedule

---

[3]http://www.merriam-webster.com/dictionary/addendum.

D was discharged by expressed waiver or waiver by estoppel and; (4) Schedule D was discharged by the doctrine of laches. For the reasons articulated below, this courts rejects Title First's arguments and denies Title First's Motion for Summary Judgment on Fidelity's Breach of Contract Claim.

### A. Schedule D Was Discharged by Fidelity's Failure to Perform

Both parties are alleging that the other failed to perform under the terms and conditions of Schedule D. The determination of whether a party's breach of a contract was a "material breach" is generally a question of fact. *Kersh v. Montgomery Developmental Ctr.* (1987), 35 Ohio App.3d 61, 63, 519 N.E.2d 665. See also *Farmers Market Drive-In Shopping Ctrs., Inc. v. Magana,* 10th Dist. No. 06AP-532, 2007-Ohio-2653, 2007 WL 1560276, ¶ 32 (holding that when there is a dispute as to whether the parties' respective actions are sufficient to satisfy the terms of the contract, a question of fact is presented for the trier of fact to decide). Therefore, since there is clearly a dispute as to the parties respective actions, this raises a question a fact for the jury to decide.

### B. Schedule D Was Discharged by Release, Expressed Waiver, or Waiver by Estoppel

In support of Title First's argument that Schedule D or the Committed Revenues provision was discharged by Release, Expressed Waiver or Waiver by Estoppel Title First argues: (1) that there are expressed waivers and a release from Mr. Simonton discharging Title First's duty to perform under Schedule D and; (2) Fidelity is estopped from recovering under Schedule D because of its constant praise and acceptance of Title First's work. It is Fidelity's contention that there was no release from the Committed Revenues provision prior to the December 30, 2000, amendment to the Agreement, which eliminated this provision. Further, Fidelity argues that Title First cannot avail itself of the

waiver defense, because the contract explicitly forbids it. Moreover, Fidelity contends that Title First cannot avail itself of equitable arguments, since it has unclean hands.

Under Ohio law, waiver is the voluntary relinquishment of a known right. *State ex rel. Wallace v. State Med. Bd. of Ohio* (2000), 89 Ohio St.3d 431, 435, 732 N.E.2d 960. The waiver of contractual rights typically requires consideration unless the actions of the party making the waiver are such that he must be estopped from insisting upon the right claimed to have been relinquished. *Marfield v. Cincinnati, D. & T. Traction Co.* (1924), 111 Ohio St. 139, 145, 144 N.E. 689. The party claiming a waiver has the burden of proof of the facts on which he relies to establish such waiver and waiver of contractual conditions is generally a question of fact. *Wagner v. Flo-lizer, Inc*.1988 WL 38848, * 6. Moreover, the parol evidence rule states that absent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements. *Galmish v. Cicchini* (2000), 90 Ohio St.3d 22, 27, 734 N.E.2d 782.

In the instant case, the waiver clause in the Agreement states:

> By failing to exercise any of its rights hereunder, [Fidelity] shall not be deemed to have waived any breach on the part of [Title First] or to have released [Title First] from its obligations hereunder. The waiver by either party of a breach of any provision of this Agreement shall not be deemed a continuing waiver or a waiver of any subsequent breach of any provision of this Agreement.

Title First proffers several correspondences between Mr. Henry and Mr. Simonton and correspondence between Mr. Henry and Richard R. Lauber (Vice President of Fidelity) as evidence that Fidelity waived or released its rights under Schedule D. However, as Fidelity argues, these correspondences cannot be used constitute waiver, since they do not explicitly or implicitly waive

Schedule D. Moreover, even if these documents did explicitly waive Fidelity's rights under Schedule D, a continuing waiver would contradict the expressed terms of the Agreement. This is prohibited by the parole evidence rule. Therefore, Title First is not entitled to Summary Judgment under the doctrine of waiver.

### C. Schedule D Was Discharged by the Doctrine of Laches

Title First alleges that Fidelity failed to inform Title First of its alleged failure to perform under the Committed Revenues of Premiums provision of Schedule D. Instead, Fidelity chose to wait six years before bringing its claim. Fidelity responds arguing that Title First cannot avail itself to the equitable argument of laches because it has unclean hands. Further, Fidelity maintains that there was no undue delay in it asserting its rights.

The elements of laches are (1) unreasonable delay or lapse of time in asserting a right, (2) absence of an excuse for the delay, (3) knowledge, actual or constructive, of the injury or wrong, and (4) prejudice to the other party. *State ex rel. Polo v. Cuyahoga Cty. Bd. of Elections* (1995), 74 Ohio St.3d 143, 145, 656 N.E.2d 1277.

Fidelity argues that although it knew the amount Title First was paying to Fidelity, Fidelity did not know what percentage of Title First's revenues that represented or that Title First had breached the Committed Revenues Requirement. Fidelity states that this is because Title First refused to comply with the audit requirements. Fidelity has presented evidence showing that it did not delay in bringing its claim and, consequently, Title First's Motion for Summary Judgment as to Fidelity's breach of contract claim with respect to the Agreement is denied.

## II.    Fidelity's Claim for Breach of Contract (APA)

According to Fidelity, Title First and Mr. Henry have breached the clear and unambiguous terms of the APA by re-hiring employees, re-opening Title First's Michigan operations, soliciting Fidelity's customers, "flipping" transactions away from Fidelity and to other underwriters, and disparaging Fidelity.  Title First denies recruiting Fidelity's employee and additionally, the "duress" APA does not contain language which  would prohibit Title First from soliciting Fidelity's customers or doing business in Michigan.

Generally, a breach of one term in a contract does not discharge the parties' obligations under the contract unless the performance of that term is material to the purpose of the agreement.  *Software Clearing House, Inc. v. Intrak, Inc.* (1990), 66 Ohio App.3d 163, 170.  The issue of whether a material breach of contract has occurred is a question of fact.  *Kersh,* 35 Ohio App.3d 61. Here, there is a dispute as to the parties respective actions and performance under the terms of the APA and this raises a question a fact for the jury to decide.  Consequently, Title First's motion with respect to this claim must be denied.

## III.    Fidelity's Claim for Breach of Fiduciary Duty

Title First argues that Fidelity's claim that Title First breached its fiduciary duty by failing to hold Remittances in trust, commingling Remittances, and failing to remit as required under the Agreement, must be dismissed because these allegation are covered under specific provisions of the Agreement.  Fidelity counters asserting that Title First has breached its fiduciary duty by commingling premiums required to be held in trust for Fidelity and using those trust premiums to fund Title First's operations.

The elements of breach of fiduciary duty are: (1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately therefrom. *Harwood v. Pappas & Assoc., Inc., Cuyahoga,* App. No. 84761, 2005-Ohio-2442, at ¶ 26. A claim of breach of fiduciary duty is basically a claim for negligence that involves a higher standard of care. *Otterbein Homes*, 889 N.E.2d 1077.

Title First's argument that Fidelity's breach of fiduciary duty claim should be dismissed because it sounds in contract law is without merit, since a claim for breach of fiduciary is basically a tort claim for negligence that involves a higher standard of care. *David A. Flynn, Inc. v. General Motors Acceptance Corp.* 2008 WL 2185377, * 3. Therefore, Title First's Motion for Summary Judgment with respect to Fidelity's breach of Breach of Fiduciary Duty Claim is denied.

**IV.  Fidelity's Claim for Conversion**

Title First and Mr. Henry maintain that Fidelity's conversion claim should be dismissed on three grounds: (1) Title First never wrongfully exercised dominion and control over Fidelity's property; (2) Fidelity did not demand return of the allegedly converted property; and (3) Fidelity cannot show recoverable damages. Fidelity argues that Title First and Mr. Henry converted its funds when they commingled Fidelity's funds with their funds and personally used Fidelity's funds.

The elements of a conversion claim are: (1) ownership or right to possession of the property at the time of conversion; (2) conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages. *City of Findlay v. Hotels.com, L.P.,* 441 F. Supp.2d 855, 865 (N.D. Ohio 2006). Further, demand and refusal are required which turn the otherwise lawful possession into an unlawful one by reason of a refusal to comply. *Id.* An action for conversion of money is generally not recognized except where the money is specifically identifiable. *Id.* Ohio courts have found that

money is specifically identifiable when it is paid by a third party to defendant for work performed by plaintiff. *Id.*

Fidelity has presented sufficient evidence to survive Title First is Motion for Summary Judgment regarding its Conversion claim. Fidelity states that when Title First accepts premiums into its escrow account, it knows that a portion of those funds belongs to Title First. Further, Fidelity argues that because Title First was required to hold premiums in trust in a fiduciary capacity for Fidelity and then deliver those to Fidelity, Fidelity had a beneficial ownership in those specific monies as a matter of law. Moreover, Fidelity claims that Title First admitted that it commingled Fidelity funds in its operating account. Additionally, Fidelity contends that Mr. Henry is individually liable because as CEO and a shareholder, he was in a position to direct, participate in and benefit from the conversion. Finally, Fidelity submits that it has been harmed in the form of premiums not remitted and lost interest on those funds. Therefore, this court concludes that Title First's motion for summary judgment on Fidelity's claim is denied.

## V. Fidelity's defamation claim against Title First and Mr. Henry

Title First and Mr. Henry argue that Fidelity cannot establish its defamation claim, because Fidelity has failed to present admissible evidence that Mr. Henry made any actionable defamatory statement to anyone. Fidelity alleges that both Henry and Title First are liable for statements made about Fidelity which are defamatory per se.

To establish a claim for defamation, a plaintiff must offer evidence of the following: Under Michigan law, a defamation claim requires: "(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm

29

(defamation per se) or the existence of special harm caused by the publication" (defamation per quod). *Mitan v. Campbell,* 474 Mich. 21, 24; 706 N.W.2d 420 (2005).[4]  A communication is defamatory if, under all the circumstances, it tends to so harm the reputation of an individual that it lowers the individual's reputation in the community or deters others from associating or dealing with the individual."Further, this court may determine, as a matter of law, whether a statement is actually capable of defamatory meaning.   *Kefgen v. Davidson,* 241 Mich. App 611, 617; 617 NW2d 351 (2000).

In the instant case, Fidelity alleges that Mr. Henry, Mr. Hewitt, and Michael Allen made false and defamatory statements to a third party characterizing Fidelity as having taken illegal action to harm Title First.  Although Title First and Mr. Henry  argue that Fidelity relies on inadmissible hearsay to substantiate its claim, Fidelity has presented evidence to the contrary.  Indeed, Fidelity relies on an affidavit from Gale Dolin of Tranex Financial, one of Fidelity's customers.  In the affidavit, Ms. Dolin states that Henry told her that Fidelity and Ms. Gallagher engaged in improper behavior when they took Title First's employees.  Further, Ms. Dolin stated that these statements created doubt as to whether Tranex should continue to use Fidelity for its title business.  Further, Fidelity also relies on statements that Mr. Henry made to third parties and affirmed in his deposition that he stated that Fidelity took Title First's employees.  Consequently, viewing the facts in the light most favorable to Fidelity this court must deny Title First's motion on this claim.

---

[4]The court will apply Michigan law to Fidelity's

IV.

*Conclusion*

**IT IS ORDERED** that Defendants' Motion for Summary Judgment [D/E 106] is DENIED.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment [D/E 105] is GRANTED IN PART and DENIED IN PART.

**IT IS SO ORDERED**.

DATED:  September 22, 2008                    **s/Anna Diggs Taylor**
                                              ANNA DIGGS TAYLOR
                                              UNITED STATES DISTRICT JUDGE

---

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that the foregoing Memorandum Opinion and Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail disclosed on the Notice of Electronic Filing on September 22, 2008.

<u>s/Johnetta M. Curry-Williams</u>
Case Manager